IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiffs, | **4:16CR3038** |
| vs. | |
| VICTOR M. AVALOS, and CAROLINA B. LARA, | **FINDINGS, RECOMMENDATION AND ORDER** |
| Defendants. | |

Defendants Victor Avalos and Carolina Lara have moved to suppress all evidence obtained during a vehicle search conducted on February 13, 2016, all evidence obtained as fruit of the alleged illegal vehicle search, any statements made during the traffic stop, and all evidence gathered from the search of their cell phones. (Filing Nos. 84 & 90). For the following reasons, Defendants' motions should be denied.

STATEMENT OF FACTS

After hearing extensive testimony and reviewing the documentary, audio, and video evidence, the undersigned magistrate judge finds the following facts are credible.

On the morning of February 13, 2016, while patrolling interstate traffic, Deputy Jason Henkel observed a white Armada SUV with Florida license plates. Henkel followed the vehicle without turning on his overhead lights or making any attempts to pull it over. While doing so, he observed the vehicle take an exit ramp off the interstate. At the top of the exit, the Armada did not completely stop and pulled out in front of an approaching truck, causing the truck to hit its brakes to avoid a collision. Henkel followed the Armada to a nearby gas station to determine whether the driver was fatigued or under the influence. He drove around the station and parked his cruiser on the

passenger side of the Armada. Henkel did not turn on his cruiser's lights or otherwise demonstrate that he was making a traffic stop.

Henkel approached the driver, Defendant Garcia, who was now standing at the back of the Armada. Two adult males (including Avalos), two adult females (including Lara), and a toddler were in the vehicle. Henkel asked Garcia for his driver's license. Garcia reached in his wallet and produced a California ID. Garcia quickly took another ID from his wallet and asked for the first one back. Henkel retained and reviewed both IDs. Garcia's license was suspended, which he admitted to Henkel. Henkel asked about Garcia's destination. Garcia responded that he did not know where the group was going, but the other passengers did. While Henkel and Garcia were having this discussion, other passengers in the Armada exited the vehicle and entered the convenience store.

Henkel decided to issue Garcia a warning for the traffic offense. Henkel contacted Deputy Jason Mayo and asked for his assistance at the scene. Henkel asked Garcia to sit in the passenger seat of Henkel's patrol car while the warning ticket was written. Before Garcia entered the cruiser, Henkel patted Garcia down to check for weapons. While in the cruiser, Henkel and Garcia continued to talk about the purpose of the road trip and destination. Garcia stated that the passengers were related and that they were going to a funeral. A short time later, Garcia stated they were headed to a family reunion. Later, he told the officer they were attending a rosary. At another point, Garcia stated they were traveling to see the snow. Based on Garcia's answers, it was unclear whether the passengers were traveling to the event or the event had already occurred. At one point when Henkel asked where the event was, Garcia responded "a ways back." Regardless, Garcia remained unable to provide a city or state of destination.

While in the cruiser, Henkel tried to investigated Garcia's criminal history. Garcia stated he was previously arrested, but he initially claimed he was unable to identify the

crime underlying that arrest. In response to Henkel's suggestion, Garcia later stated the crime was assault. But upon receipt of Garcia's criminal history, Henkel discovered Garcia was previously convicted of a felony and had been involved in a narcotics crime. Garcia's inaccurate responses indicated he was attempting to conceal his criminal history.

During Henkel's extensive history of performing law enforcement work, (Filing No. 146 at CM/ECF pp. 10–11), he had never encountered a driver who was truly unaware of his travel destination. (Filing No. 146 at CM/ECF pp. 10–11). Henkel also observed that Garcia was extremely nervous, and contrary to the innocent travelling public, this nervousness did not subside during the course of a stop. (Filing No. 149 at CM/ECF p. 34). Henkel noticed Garcia's trembling hands, labored breathing, and a visible carotid pulse throughout the entire traffic stop.

When Deputy Mayo arrived on the scene, he and Henkel discussed the situation. Henkel directed Mayo to check the rental agreement and determine who rented the Armada. Mayo approached the Armada to speak with Defendant Lara, who had moved to the driver's seat. The two other male passengers, Avalos and Yucupicio, attempted to leave the Armada and were instructed to remain in the vehicle for the officer's safety. Mayo spoke with Lara, viewed her ID, and asked to see the rental agreement for the vehicle. According to the agreement, Lara had rented the vehicle and was the sole authorized driver. The vehicle was scheduled to be returned to the California rental location on February 13, 2016 at 3:00 pm. (Exh. 8).

Mayo approached the vehicle a second time to receive consent to search. Mayo spoke with Lara at the driver's door. Avalos was located in the passenger's seat; Prado was seated behind the driver's seat: the toddler was in the center of the back seat; and Yucupicio was seated in the third row of seating on the passenger's side. Mayo spoke with all the passengers, explaining Garcia was receiving a warning for driving with a

suspended license. After asking if there was anything illegal in the vehicle, Mayo asked if he and Henkel could search the vehicle, stating "If you guys are okay with it, we'd like to just check the back and make sure there isn't 500 kilos of mari-- methamphetamine or something if you're cool with that. Okay? Is that alright?" (Exh. 3 at 8:25). Lara agreed to Mayo's request with a "yes" or "yea" and nodded her head in agreement. The other passengers similarly communicated their agreement.

Mayo did not promise anything, and he did not threaten anyone or brandish his weapon to gain consent to search the vehicle. No one in the vehicle appeared to be under the influence of drugs or alcohol. All occupants spoke English: No one indicated any inability to understand Mayo.

Mayo returned to Henkel's vehicle and informed Henkel that he had received consent to search the vehicle. But had the defendants refused consent, Henkel and Mayo would have deployed Henkel's police dog to perform a canine sniff of the vehicle. ([Filing No. 146 at CM/ECF p. 86](); [Filing No. 148 at CM/ECF p. 94]()).

Henkel and Mayo waited until another officer arrived on the scene so that the passengers would not have to stand outside in the cold while the search was conducted. Several other officers arrived on the scene. Each of the adults consented to a search of their person before being placed in the patrol cars. While the officers searched the Armada, Garcia, Yucupicio, and Avalos were in the back of Deputy Mayo's patrol car, and Lara, Prado, and the toddler were in the back of Deputy Hansen's patrol car.

Deputies Mayo and Henkel began searching the Armada, working their way from the front seat to the back. Mayo began by looking in the front passenger's side and Henkel searched the driver's side. A purse was sitting on the center console between the driver and passenger seat. Deputy Henkel looked in the purse and found approximately .2

grams of marijuana in a small plastic container. After searching the passenger compartment, the officers searched the cargo compartment, looking through the luggage. Thereafter, Henkel opened the hood of the car to search the engine compartment. Henkel noticed a piece of foam or packaging near the windshield of the vehicle. He examined the area closer and found five tightly-sealed, duct-taped packages—like that typically used for packaging controlled substances. Henkel removed the packages from the vehicle. Two additional packages were found in the air filter compartment between the engine and passenger compartments. One of packages was field tested at the scene and was presumptively positive for methamphetamine.

Shortly after the drugs were found, Mayo advised the male passengers in his vehicle of their Miranda rights and asked if they understood each of the rights. (Exh. 3 at 23:30). Henkel provided a Miranda rights advisement to the females seated in Hansen's cruiser. (Exh. 2 at 37:00). While speaking with Lara and Prado, Henkel did not threaten them or promise anything and the women did not ask Henkel to stop asking questions or indicate they were unwilling to talk. None of the officers made threats or promises to persuade Lara and Prado to waive their rights.

Thereafter, officers moved a few of the passengers from one deputy car to another. Avalos and Lara were placed together in Deputy Hansen's vehicle, where they cooperated with answering questions.

Once at the jail, Mayo requested consent to search Avalos' and Lara's phones. Mayo presented a consent to search form to Lara and Avalos, individually. Both appeared to read and understand the form and both signed it. (Filing No. 148 at CM/ECF p. 36–37; Exhs. 9 & 10). Mayo made no promises or threats to convince Lara or Avalos to sign the consent form.

Later on February 13, 2016, the packages found in the Armada were field tested to identify their content. Each package had multiple layers of wrapping, including ziplock/heat sealed bags, saran wrap, duct tape, and carbon paper with some kind of grease or film between the layers. There were two types of packages; one was a compressed brick form, and the other was slightly smaller and of a different shape. Each package type was tested. The compressed brick packaging contained over two pounds of heroin, and the smaller package contained a pound of methamphetamine. (Filing No. 149 at CM/ECF pp. 42–43).

After field testing the drugs, the packages were placed in an office filing cabinet drawer at the Lancaster County Sheriff's Office. Deputy Henkel's canine, Sacha, was deployed in the room. Sacha alerted and indicated to the odor of narcotics coming from the filing cabinet.

Deputy Henkel and Sacha have been a Nebraska State Patrol certified drug dog team since 2012, and they have been successfully tested and re-certified every year since. The yearly re-certification prior to Defendants' traffic stop occurred in October of 2015. (Exhs. 12 & 13). Sacha received an overall score of 2.31 for searching and 2.5 for indicating based upon ten test searches.[1] (Exh. 13). Sacha scored a 2 for both searching and indicating when tested on searching the exterior of an automobile. Sacha is trained and certified to detect four types of narcotics; marijuana, methamphetamine, cocaine, and heroin.

---

[1] [1] Nebraska State Patrol scoring for drug dog teams is as follows:
    1.00-1.74 Superior;
    1.75-2.49 Commendable;
    2.50-3.24 Typical;
    3.25-4.00 Suitable;
    4.01-5.00 Improvement Needed; and
    5.01-6.00 Unsatisfactory.

In addition to yearly training and certification, Henkel and Sacha train weekly on Thursdays. The training is "reality based," meaning Deputy Henkel sets up situations similar to those found in an actual field search. (Filing No. 149 at CM/ECF pp. 17–18). Henkel continually strives to advance the training to improve Sacha's capabilities. (Filing No. 149 at CM/ECF p. 33). Sacha's training is recorded by Deputy Henkel. (Exh. 14). The training records compile the time, date, and place of training, the drug or material and the quantity used for training, and the result of Sacha's training, including whether she successfully alerted and indicated. (Exh. 14). During the relevant training period of April 2, 2015 to February 13, 2016, Sacha never failed to alert and indicate to drugs which were placed for training. (Filing No. 149 at CM/ECF p. 32).

Henkel also maintains Sacha's deployment records. Between March 26, 2015 and February 11, 2016, Sacha was deployed 42 times, and she indicated to the odor of narcotics 29 of these times. (Exh. 15). Of the resulting searches, an actual find of narcotics, drug paraphernalia, or currency was found with the exception of only one time. (See Exh. 15).

As her handler, Henkel uses a series of commands and hand gestures to engage Sacha in a search and to direct her attention to certain areas. (Filing No. 149 at CM/ECF pp. 22–25). Sacha and Henkel circle around vehicles three times; first sniffing low, then at mid-level, and finally high. (Filing No. 149 at CM/ECF p. 25). Sacha is trained to passively indicate to the presence of drugs by sitting and staring at the strongest source of odor. In certain circumstances, she will lay down when there is a low find. In the presence of high finds or overwhelming odors, she may stand and freeze. (Filing No. 149 at CM/ECF p. 21).

ANALYSIS

I.  <u>Officer Contact, Detention, and Search</u>.

    A.    Nature and Duration of Contact.

Avalos and Lara argue the vehicle was illegally stopped. The Government argues Avalos and Lara lack standing to challenge the encounter because it was a consensual encounter, not a traffic stop.

"Not all personal intercourse between policemen and citizens involves 'seizures' of persons" implicating the Fourth Amendment. Terry v. Ohio, 399 U.S. 1, 19 n.16 (1968). "Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Id. There is no bright line between a consensual encounter and a seizure. Rather, the determination is fact-intensive and turns upon the unique facts of each case. United States v. Hathcock, 103 F.3d 715, 718 (8th Cir. 1997), cert. denied, 117 S. Ct. 2528 (1997); United States v. McKines, 933 F.2d 1412, 1419 (8th Cir. 1991) (en banc), cert. denied, 502 U.S. 985 (1991).

"A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area—even if the officer has no reason to suspect the individual is involved in criminal activity—provided the officer does not indicate that compliance with his request is required." United States v. White, 81 F.3d 775, 779 (8th Cir. 1996). Instead, the transformation of a consensual encounter into a seizure occurs only "when the questioning is so 'intimidating, threatening or coercive that a reasonable person would not have believed himself free to leave.'" Hathcock, 103 F.3d at 718 (quoting McKines, 933 F.2d at 1419). Circumstances

indicative of a seizure include "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" United States v. Angell, 11 F.3d 806, 809 (8th Cir. 1993) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)); Hathcock, 103 F.3d at 718; White, 81 F.3d at 779.

Lara and Avalos argue the encounter was a traffic stop and that Garcia and the others were unlawfully seized when Henkel approached and began speaking with Garcia. But when Henkel approached, Garcia was standing outside the Armada and several passengers exited the vehicle and entered the convenience store. The passengers not only remained free to move, they actually did so. (Filing No. 146 at CM/ECF p. 60). Thus, even assuming Garcia was seized upon initial contact with Henkel, Lara and Avalos were not.[2]

The contact between Garcia and Henkel was a consensual encounter and not a traffic stop. Although Henkel witnessed the Armada roll through a stop sign, he did not initiate a traffic stop. Instead, Henkel followed the Armada to its destination and parked without turning on the cruiser's lights. The cruiser did not block or otherwise impede the movement of the Armada, and thus the ability of Lara (who rented the car) and Avalos to leave the station.

Lara and Avalos argue they were unlawfully detained when Garcia was patted down before entering Henkel's cruiser.[3] See United States v. Abokhai, 829 F.2d 666,

_____

[2] Lara and Avalos have no standing to challenge the seizure of Garcia.

[3] Lara and Avalos have no standing to challenge the patdown search of Garcia. And even assuming they did, when the circumstances pose a risk to officer safety, an officer may perform a pat-down search even absent any reason to believe the suspect is dangerous.

670–71 (8th Cir. 1987) (upholding a frisk in which officer placed suspects in the rear of the patrol car due to the increased risk to officer safety.). Upon learning Garcia's license was suspended, Henkel determined he would issue a warning to Garcia. Since the weather was very cold, Henkel had Garcia sit in the cruiser while the warning was written. Contrary to the arguments raised by Lara and Avalos, the pat search is not evidence that the initial encounter was a traffic stop and not consensual. Rather, the pat search occurred after the officer discovered, during the initial consensual encounter, that Garcia was driving on a suspended license. Based on that discovery, the officer had probable cause to issue a warning ticket and pat search Garcia for officer safety before Garcia was seated in Henkel's vehicle.

Lara and Avalos may be arguing they were unlawfully detained while the Henkel was issuing a warning ticket for Garcia. Even assuming Lara and Avolos have standing to raise this argument, it lacks merit. "Generally, a stop should last no longer than is necessary to dispel the officer's suspicions." United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (citing United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001)). But "[a] stop may be extended for a length of time sufficient to enable the [officer] to ask the driver to step out of the vehicle or wait in the patrol car, to ask about the motorist's destination and purpose, to check the validity of the driver's license and registration, and to check the driver's criminal history[.]" Long, 532 F.3d at 795 (citing Jones, 269 F.3d at 924); see also United States v. Barragan, 379 F.3d 524, 528 (8th Cir. 2004) (An officer "may detain [an] offending motorist while the officer completes a number of routine but somewhat time-consuming tasks[.]"). And further detention is permitted if the information obtained during the traffic stop prompts a reasonable suspicion of criminal activity sufficient to justify a further detention United States v. Flores, 474 F.3d 1100, 1103 (8th Cir. 2007) (quoting Jones, 269 F.3d at 925).

For reasonable suspicion to exist, the officer must be aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion that a crime [was] being committed." United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998)(citations omitted). In determining whether an officer has reasonable suspicion to extend a stop, the court looks to the totality of the circumstances. Id. And the court may also consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." Id. However, the suspicion cannot be based on a hunch or circumstances which "describe a very large category of presumably innocent travelers." Id. (citing Reid v. Georgia, 448 U.S. 438, 440–41 (1980)).

Although Deputy Henkel's contact with Garcia began as a consensual encounter, upon learning Garcia's license was suspended, Henkel decided he would issue Garcia a warning for the infraction. Accordingly, the encounter was permitted to last the length of time needed to write the warning and to perform routine tasks associated with a stop, including asking about Garcia's trip and checking his criminal history. Henkel and Garcia continued to talk and discuss the destination, purpose, and relationship among the passengers. Henkel's suspicion grew as Garcia spoke.

Henkel's consensual encounter with Garcia became a seizure as to Lara and Avalos when the vehicle passengers were not permitted to leave the vehicle. This occurred after Garcia indicated he did not know where he and his companions were traveling, had altered his story about the purpose of the trip several times, and was less than candid with Deputy Henkel about his criminal history, with continuing and excessive nervousness—trembling hands, labored breathing, and a visible carotid pulse— throughout the encounter. Based on the totality of circumstances, Henkel had a reasonable suspicion of ongoing criminal activity. See Beck, 140 F.3d at 1139; see also United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995)(finding that suspicious travel

plans, inconsistent answers, and nervousness were sufficient to constitute reasonable suspicion). The officers were allowed to reasonably extend the detention of not only Garcia, but all vehicle passengers—including Avalos and Lara—until they could confirm or dispel that suspicion.

Lara and Avalos were not illegally detained in violation of the Fourth Amendment.[4]

B.     The Vehicle Search.

1.     Standing to Contest Search.

The Fourth Amendment guarantees citizens the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. For the Fourth Amendment to attach, the defendant must have a reasonable expectation of privacy in the area searched or the items seized. Rakas v. Illinois, 439 U.S. 128, 143 (1978); Katz v. United States, 389 U.S. 347, 361 (1967). A defendant who challenges a search or seizure bears the burden of proving he has a reasonable expectation of privacy in the searched or seized items. Rawlings v. Kentucky, 448 U.S. 98, 104–05 (1980). Only where the Fourth Amendment has been violated should a party "benefit from the [exclusionary] rule's protection." Rakas, 439 U.S. at 134.

Factors relevant to the determination of standing include ownership, possession, and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective

---

[4] Even if the court did not find reasonable suspicion existed to extend the encounter beyond writing a warning and performing a criminal history check, the Fourth Amendment allows the officers to request consent to search from the vehicle renter (in this case, Lara) and to extend the encounter to perform a consent search. See Long, 532 F.3d 791 at 795 (asking for consent to search after the purpose of a stop has concluded and suspicion has been dispelled does not violate the Fourth Amendment).

reasonableness of the expectation of privacy considering the specific facts of the case. United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994). To challenge the search of a rental vehicle, the defendant must "present at least some evidence of consent or permission from the lawful owner/renter to give rise to an objectively reasonable expectation of privacy." United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995). "[A] mere passenger does not have standing to challenge a vehicle search where he has 'neither a property nor a possessory interest in the automobile.'" United States v. Anguiano, 795 F.3d 873, 878 (8th Cir. 2015) (quoting Rakas, 439 U.S. at 148).

Defendant Lara rented the Armada and the rental agreement contained only her name as an authorized driver. Avalos claims he has equal standing to Lara because (1) he and Lara together agreed to rent the vehicle when requested by their co-defendants; (2) he was with Lara when she rented the vehicle; and (3) he had remained with the vehicle since the point it was rented. Regardless, Avalos was not an owner, registered user, or driver of the vehicle when it was stopped and there is no evidence that Avalos paid for part of the rental, signed any documents, or otherwise received consent from Lara or the rental company.

Avalos further argues he had personal belongings in the vehicle and had, in essence, resided in the vehicle for approximately two days. But "the mere duration and distance of [the] trip alone is insufficient to elevate [Avalos'] status beyond a mere passenger without a reasonable expectation of privacy." Anguiano, 795 F.3d at 876; see also Rakas, 439 U.S. at 148("We have on numerous occasions pointed out that cars are not to be treated identically with houses or [a]partments for Fourth Amendment purposes."); United States v. Jefferson, 925 F.2d 1242, 1249–51 (10th Cir. 1991)("[The] Supreme Court [did not] intend[] that any time an accused takes a long distance road trip in a car, the car is to be treated like a home for Fourth Amendment purposes.").

Avalos has failed to show he had a reasonable expectation of privacy in the vehicle sufficient to challenge the search of the Armada.

2.      Consent to Search.

Lara asserts the search of the Armada was not consensual and violated her Fourth Amendment Rights.

Consensual searches are reasonable under the Fourth Amendment. Florida v. Jimeno, 500 U.S. 248, 250–51 (1991). But consent must be knowing and voluntary. The government has the burden of proving by a preponderance of the evidence that Defendant's consent to search was freely given. White, 81 F.3d at 780. In determining whether this burden is met, the court considers the totality of the circumstances, including both the characteristics of the accused and the environment in which the consent was given. United States v. Griffith, 533 F.3d 979, 984 (8th Cir. 2008) (citing United States v. Chaidez, 906 F.2d 377, 381 (8th Cir.1990)). When assessing the voluntariness of a consent, suspect characteristics which may be relevant include:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their Miranda rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

Griffith, 533 F.3d at 984.

 Relevant environment characteristics include:

> [W]hether the person who consented: (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) objected to the search or stood

14

silently by while the search occurred.

Griffith, 533 F.3d at 984.  These factors are not to be applied mechanically, but serve as a guide.

After determining Lara was the renter of the vehicle, Deputy Mayo approached her and requested consent to search. He informed Lara and the other passengers that Garcia was receiving a warning and then asked if the officers could search the vehicle. Lara agreed to Mayo's request with a "yes" or "yea" and nodded her head in agreement.

Lara is an English-speaking adult. She did not appear to be under the influence of drugs or alcohol. At the time she was asked for consent, neither she, nor any of the vehicle occupants, were handcuffed or restrained, she was not isolated from the other passengers, and the encounter occurred in a public place with many travelers coming and going. Mayo did not make any threats or promises to secure consent. Instead, his tone was cordial and relaxed. Lara consented both verbally and nonverbally. Although the scope of the consent given remains an issue, the court finds Lara knowingly and voluntarily consented to a search of the Armada.

3.      Scope of Consent.

Lara argues even if consent was obtained, Henkel and Mayo exceeded the scope of the consented search. Lara argues any consent she provided, if any, was limited to "the back" or cargo area of the vehicle. Therefore, Lara claims the officers exceeded the scope of her consent when they began searching the vehicle in the front passenger area, to include the search of her purse of the front seat console. (Filing No. 180 at CM/ECF pp. 23–24).

"The standard for measuring the scope of a [person's] consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" United States v. McMullin, 576 F.3d 810, 815 (8th Cir. 2009) (quoting Jimeno, 500 U.S. at 251). "The scope of a search is generally defined by its expressed object." Jimeno, 500 U.S. at 251 (citing United States v. Ross, 456 U.S. 798 (1982). In assessing the scope of a person's consent, the court must examine the totality of the circumstances, including the language of a suspect's consent and his actions during the officers' search. See United States v. Starr, 533 F.3d 985, 996 (8th Cir. 2008). Specifically, the court may consider a suspect's failure to object when a search allegedly exceeds what is claimed to be the limits of the consent. This failure to object may be an indication that the search was within the scope of consent. See United States v. Lopez-Mendoza, 601 F.3d 861, (8th Cir. 2010).

Deputy Mayo requested consent to "check the back"[5] while standing at the driver's side door. Mayo further elaborated, stating his purpose was to "make sure there [wasn't] 500 kilos of mari-- methamphetamine or something." Mayo's choice of words taken with the position of himself and the defendants would have conveyed to a typical reasonable person that he was requesting to search only the cargo area of the Armada (behind the passenger seats). A reasonable person would have understood that the officer

---

[5] The Government argues the court should not limit the scope of consent because the recording is unclear whether Deputy Mayo asked to "check back" and search the vehicle or to "check the back" for drugs. After reviewing the video the court agrees that Deputy Mayo's exact wording is not 100% clear. However during the hearing, Mayo did not testify that he independently remembered stating "check back" as opposed to "check the back," but testified himself that the wording was unclear. Filing No. 148 at CM/ECF p. 56. Accordingly, as the government has failed to provide direct evidence or testimony as to the exact wording. And the government bears the burden of proof. See Lopez-Mendoza, 601 F.3d at 866 (stating the government bears the burden of proving consent by a preponderance of the evidence).

16

was looking for a significant or large amount of drugs—an amount not likely to be found in the passenger-filled cabin.[6]

In response to Mayo's request, Lara simply nodded her head and said "yea." A while later each of the defendants was asked to exit the vehicle and was placed in the back of several police cruisers. Mayo did not ask for consent again or receive clarification as to the scope. After receiving the consent described above and removing the passengers to police cruisers, Deputies Mayo and Henkel began the search of the Armada at the front seat.

Defendant Lara admits she never withdrew her consent, and that neither she nor the other passengers objected to the search. And Lara acknowledges that under Eighth Circuit law, the court may consider a suspect's failure to object as proof that the search did not exceed the consent given. But Lara argues that she was not present for the search and was therefore unable to object. Lara asserts she was placed in the back of a locked patrol car and was unable to roll down the windows or otherwise communicate her objections to the searching officers. She further argues that due to the position of Deputy Hansen's vehicle, she was unable to fully view the ongoing search.

Deputy Hansen's vehicle was parked a short distance (approximately ten feet) from the back passenger's side of the Armada. It was positioned at a slight angle facing the Armada. Prado and her toddler were placed behind the driver's seat in Hansen's vehicle and Lara was placed in the back passenger side. (Exh. 2 at 21:50). Deputy Hansen

---

[6] The government also argues that the scope of the search should not be limited because by indicating they would be searching for drugs, the officers impliedly received consent to search any area of the vehicle where drugs may be hidden. But this rule has typically been applied in cases where the officer's receive general consent to search a vehicle without any explicit limitations on scope as exist in this case. Jimeno, 500 U.S. at 251; see also United States v. Siwek, 453 F.3d 1079, 1085 (8th Cir. 2006); United States v. Alverez, 235 F.3d 1086 (8th Cir 2000); United States v. Hammons, 152 F.3d 1025 (8th Cir. 1998); United States v. Gleason, 25 F.3d 605 (8th Cir. 1994).

remained in the vehicle with Lara and Prado as the Armada was searched. ([Filing No. 148 at CM/ECF p. 19](#)).

While the court finds that Lara was able to communicate any objections regarding the search to Deputy Hansen, the record is not clear that with the position of Deputy Hansen's vehicle and from Lara's location in the far side of his vehicle, that Lara was able to fully see the ongoing search. Accordingly, the court will not take into consideration Lara's failure to object to the extent of the search.

The court finds that the government has failed to carry its burden of establishing that the vehicle search was within the scope of Lara's expressed consent.

4.     Inevitable Discovery.

The Government argues that even if the court finds the consent to search was invalid, the evidence is still admissible under the Inevitable Discovery Doctrine. The Government argues that but-for Lara's consent, the officers would have deployed Henkel's police dog Sacha around the Armada and she would have alerted and indicated to the presence of drugs.

"Evidence is purged of taint and should not be suppressed '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" United States v. McManaman, 673 F.3d 841, 846 (8th Cir. 2012) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). The inevitable discovery doctrine applies when the government proves "by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the

time of the constitutional violation." McManaman, 673 F.3d at 846. In this analysis, "it is important to focus not on what the officers actually did after unlawfully recovering evidence, but on what the officers were reasonably likely to have done had the unlawful recovery not occurred." Id. (citing United States v. Villalba-Alvarado, 345 F.3d 1007, 1020 (8th Cir. 2003)).

Had Lara failed to consent, Henkel would have deployed his police dog Sacha, who was in the back of Henkel's cruiser, to sniff around the vehicle. In fact, when Mayo returned to Henkel's vehicle, Henkel asked Mayo whether Sacha should be deployed around the vehicle. (Filing No. 148 at 64-65). Mayo responded in the negative, thus cancelling this means of investigation based on Lara's consent to search. (Id.). The court finds the second prong is met. See Hammons, 152 F.3d at 1030 (finding the second prong was met where the officer was prepared to call for a canine unit had the suspect failed to provide consent).

Lara argues the first prong is not met because Henkel could not have lawfully deployed Sacha because to do so would have unreasonably extended the stop. As discussed above, the court does not find Avalos' and Lara's detention was unreasonable. Garcia's behavior and answers created a reasonable suspicion of ongoing criminal activity and justified further detention even after the warning ticket was issued. Accordingly, the officers could have lawfully detained Avalos and Lara while Sacha was deployed to perform a canine sniff.

Lara also argues the Government fails to establish the first prong because there is insufficient evidence to show that Sacha would have alerted and indicated to the odor of narcotics around the Armada. Lara argues that because the packages were wrapped in multiple layers, smeared with axle grease, and tucked and taped into the engine

compartment, the government cannot prove Sacha would have alerted and indicated to the presence of the drugs.

The Armada contained .2 grams of marijuana in the passenger compartment held in a small plastic container, two packages of either meth or heroin in the air filter compartment, and five packages of meth or heroin in the engine compartment. The weight of the heroin and methamphetamine totaled around ten pounds. The seven packages of meth and heroin were packaged in numerous layers.

Considering Sacha's deployment records from March 26, 2015 to February 11, 2016, Sacha was deployed 42 times, and she indicated to the odor of narcotics 29 of these times. (Exh. 15). With only one exception, following Sacha's indications, officers searched and always found illegal drugs or large amounts of currency. Sacha's find-per-indication rate was approximately 97% for the year preceding the stop in this case. (See Exh. 15).

In addition to the above referenced deployment record, Sacha has searched for drugs in vehicles in the field over 100 times, and has indicated to methamphetamine packaged in a similar way as in this case and hidden in engine compartments. She has indicated to the presence of similar small quantities of marijuana in vehicles similar to that found in Lara's purse. Based on his experience with Sacha, Henkel testified that the manner of packaging the illegal substances would not have impeded or defeated Sacha's ability to smell the drugs. (Filing No. 149 at CM/ECF pp. 49–50).

Based on Sacha's record of reliability and Deputy Henkel's credible testimony, the court finds Sacha would have alerted and indicated to the presence of drugs had she been deployed to perform a canine sniff around the Armada. And once that indication occurred, the officers would have performed a lawful probable cause search of the vehicle and the drugs would have been found.

Thus, even absent consent to search the front passenger and engine compartment of the vehicle, the drugs obtained from a search of those areas would have been inevitably discovered. This evidence should not be suppressed.

II.      Statements.

Avalos and Lara also seek to suppress statements made after the execution of the vehicle search. To the extent Defendants challenge the statements made as fruit of an illegal detention or vehicle search, for the reasons discussed above, Defendant's motion should be denied.

The defendants also argue the statements were not voluntary but were the result of coercive police tactics. (Filing No. 85 at CM/ECF p. 9; Filing No. 94 at CM/ECF p. 4). To be admissible under the Fifth Amendment, a statement of the defendant must be voluntary. The test for voluntariness is whether, "in light of the totality of circumstances, pressures exerted upon the suspect have overborn his will." United States v. Jorgensen, 871 F.2d 725, 729 (1989)(quoting Haynes v. Washington, 373 U.S. 503, 513–14 (1963)). Factors the court should examine include the details of the interrogation including tactics used by the officer, and characteristics of the defendant. United States v. Wilson, 787 F.2d 375, 381 (8th Cir. 1986).

Miranda warnings are required when an individual has been subjected to a "custodial interrogation." Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). The warnings are necessary "to dispel the compulsion inherent in custodial surroundings." Id. at 444. A person is in custody for purposes of Miranda "either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing Miranda, 384 U.S. at 444).

Miranda warnings are required when an individual has been subjected to a "custodial interrogation." Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). The warnings are necessary "to dispel the compulsion inherent in custodial surroundings." Id. at 444. A person is in custody for purposes of Miranda "either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing Miranda, 384 U.S. at 444).

Both Avalos and Lara were advised of their Miranda rights and indicated they understood each of those rights.[7] Avalos or Lara did not appear to be under the influence of alcohol or drugs during the questioning. And there is similarly no evidence indicating Lara and Avalos were promised anything or were coerced or threatened into making statements. Throughout the encounter, Lara and Avalos were cooperative, especially once the officers placed them together in a vehicle. There is no basis for suppressing their statements under the Fifth Amendment.

III.   Cell Phone Search.

Avalos and Lara also seek to suppress all evidence gathered by searching their cell phones. The defendants argue any consent to search their phones was invalid and was obtained during an unlawful seizure and under coercive circumstances.

The same standard of voluntariness applies to consent for cell phone searches and for vehicle searches. The government has the burden of proving voluntary consent by a preponderance of the evidence. White, 81 F.3d at 780. The court considers the totality

---

[7] In fact, at one point defendant Lara even reminded co-defendant Prada of those rights and requested that Prada remain silent. (Exh. 6 at 6:00).

of the circumstances, including characteristics of the accused and the environment. Griffith, 533 F.3d at 984 (citing Chaidez, 906 F.2d at 381).

Deputy Mayo received consent to search the phones from Avalos and Lara after they were arrested and taken to the Lancaster County Jail. Mayo presented the consent to search form to Lara and Avalos individually. Mayo testified that when Lara and Avalos were presented with the form, both appeared to read and understand it and both signed the form. (Filing No. 148 at CM/ECF p. 36–37; Exhs. 9 & 10). Mayo did not make promises or threats to coax Lara or Avalos to sign the form. The court finds that their consent to search the cell phones was voluntary and was not the product of coercive police tactics.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, Senior United States District Judge,  pursuant to 28 U.S.C. § 636(b), that the motion to suppress filed by the defendants (Filing Nos. 84 & 90) be denied in their entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that the jury trial of this case is set to commence before Richard G. Kopf, Senior United States District Judge,  in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on May 8, 2017 or as soon thereafter as the case may be called, for a duration of five (5) trial days. Jury selection will be held at the commencement of trial.

March 20, 2017.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge